UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DESMOND ELIJAH BELLOMY and ) <br> WILLIAM QUEJOHN DIXON, ) <br> ) <br> Defendants. | Case No. 3:24-cr-00012-GFVT-MAS <br><br> **MEMORANDUM OPINION** <br> & <br> **ORDER** |

*** *** *** ***

This matter is before the Court on the Report and Recommendation filed by United States Magistrate Judge Stinnett addressing the Defendants' Motions to Suppress [R. 47; R. 22; R. 23.] The Defendants seeks to suppress the fruits of a November 7, 2023 traffic stop that led to a canine sniff and vehicle search [R. 22; R. 23.] Judge Stinnett recommends that the Court deny the Defendants' suppression motions. [R. 47.] Defendant Dixon and Defendant Bellomy have now objected to Judge Stinnett's Recommendation. [R. 48; R. 49.] The Court will **ADOPT** Judge Stinnett's Report and Recommendation for the following reasons.

**I**

**A**

Defendants Desmond Bellomy and William Dixon are both charged with being felons in possession of a firearm, a violation of 18 U.S.C. § 922(g)(1). [R. 1.] They each filed motions to suppress evidence obtained as the result of a vehicle search on November 7, 2023. [R. 22; R. 23.] This Court referred the matter to Magistrate Judge Matthew A. Stinnett. [R. 24.] Judge Stinnett held a suppression hearing, [R. 33], and issued a Report and Recommendation that the

Defendants' suppression motions be denied. [R. 47.] Both Defendants have now objected. [R. 48; R. 49.]

This case, and the relevant suppression motions and Recommendation, stems from a November 7, 2023, interaction between the Defendants and police. On that date, Kentucky State Police Troopers Richard Ellis and Ethan Whitlock were parked in separate marked patrol vehicles at a Pilot Travel Center in Simpsonville, Kentucky. [R. 37 at 8-9.] They observed a silver Cadillac with tinted windows and a temporary license tag pull into the parking lot and stopping briefly in front of their vehicles. *Id*. at 9, 11-12. The Troopers perceived the occupants staring at the officers for approximately 30 seconds before the vehicle reversed into a clearly marked handicap spot without displaying a handicap placard. *Id*. at 11-14. After parking, driver Bellomy and passenger Dixon exited the vehicle and entered the Pilot. *Id*. at 18.

Trooper Ellis was approaching the vehicle on his way to the restroom to observe the VIN when both Troopers saw Dixon and Bellomy returning. *Id*. at 19-20. Dixon initially headed toward the passenger side but abruptly turned and reentered the travel center upon seeing Trooper Ellis. *Id*. Bellomy reached the driver's side, and Trooper Ellis initiated the encounter by noting that the car was parked in a handicap space and requesting Bellomy's identification. *Id*. Bellomy provided a Kentucky state identification card rather than a driver's license. *Id*. at 21. While Trooper Ellis spoke with Bellomy, Trooper Whitlock returned to his patrol vehicle and ran Bellomy's information through his Mobile Data Terminal. *Id*. at 153-54. The check revealed several prior drug charges and a weapons charge, as well as a pending case involving a stolen vehicle. *Id*. It also confirmed that Bellomy did not have a valid driver's license.

After completing the identification check, Trooper Whitlock retrieved his K9 partner, Dex, to conduct a free-air sniff around the Cadillac. *Id*. at 155. During his deployment, Dex was

initially distracted and walked around the vehicle three times. *Id*. at 157-59. Dex ultimately pulled away from the vehicle to relieve himself in a nearby patch of grass, after which Trooper Whitlock re-deployed him. *Id*. at 159-160. Dex resumed his task demonstrably more focused and began barking by the time the pair passed the passenger-side front door. *Id*. at 160. Once the pair made it to the driver's side door, Trooper Whitlock used a "check" command and Dex immediately alerted. *Id*. at 160, 172-73. Dex's alert was marked by frantic barking near the driver's door, a reaction that Trooper Whitlock described as a typical response when detecting the odor of narcotics. *Id*. at 160. Following the alert, the Troopers searched the Cadillac and recovered two firearms. *Id*. at 167-68. Bellomy was arrested at the scene. Dixon, who did not return to the vehicle, was later located and charged.

**B**

In his Recommendation Judge Stinnett reached a number of conclusions. First, he determined that Dixon did not have standing to challenge the stop or the search of the Cadillac from which the contraband was retrieved. [R. 47 at 4-7.] Then, Judge Stinnett turned to the legality of the initial traffic stop and determined that it was supported by probable cause. *Id*. at 8-9. Next, Judge Stinnett determined that the troopers properly extended the stop to address driver Bellomy's license-related infraction and properly dispose of the vehicle which Bellomy was not authorized to drive. *Id*. at 9-11. Judge Stinnett also concluded that the officers had reasonable suspicion to extend the stop based on the totality of the circumstances. *Id*. at 11-15. Finally, Judge Stinnett determined that the vehicle search itself was constitutional. *Id*. at 15-23. In doing so Judge Stinnett considered Dex's reliability and training, alleged cuing by his handler, his momentary break, and the ultimate lack of narcotics within the vehicle. *Id*. Thereafter Judge Stinnett recommended that the Defendants' suppression motions be denied. *Id*. at 22-23.

3

II

Dixon offers four main objections to Judge Stinnett's Recommendation. First, he objects to Judge Stinnett's conclusion that Dixon did not have standing to challenge the search of the vehicle and that he was not "seized" within the meaning of the Fourth Amendment. [R. 48 at 1-5.] Second, he objects to Judge Stinnett's conclusion that the troopers did not unlawfully extend the traffic stop. *Id*. at 6-7. Third, he objects to Judge Stinnett's conclusion that there was reasonable suspicion to extend the stop. *Id*. at 7-18. Finally, he objects to Judge Stinnett's conclusion that the vehicle search was reasonable. *Id*. at 18-24. Bellomy echoes these last three objections. [R. 49.] The Court reviews these objections to the Recommendation *de novo*. 28 U.S.C. § 636(b)(1)(c).

A

The Court first considers Dixon's objection that he did in fact have standing to challenge the seizure and the vehicle search. Throughout this portion of his objections, Dixon focuses entirely on Judge Stinnett's determination that he was not seized and therefore does not have standing. [R. 48 at 1-5.] Indeed, he states that "regardless of whether [Dixon] remained at the scene of the seizure, [he] was seized by virtue of the seizure of his driver… [Dixon] therefore has standing to challenge the stop, seizure and subsequent search of the vehicle." *Id*. at 4. The Court therefore sees resolution of Dixon's standing objection as revolving around the question of whether or not he was seized.

An individual's standing to challenge the duration of a stop arises from the person's "seizure." *See United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008) ("Not only the driver of a stopped vehicle, but a passenger as well, is seized within the meaning of the Fourth Amendment and thus may challenge the legality of the stop….[i]f either the stopping of the car,

4

the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations"). A Fourth Amendment seizure "occurs only when an officer (1) 'applies physical force to restrain a suspect' or (2) uses a 'show of authority' that actually causes the suspect to submit." *United States v. Phillips*, 677 F. App'x 294, 295 (6th Cir. 2017) (quoting *United States v. Jeter*, 721 F.3d 746, 751–52 (6th Cir. 2013)). In other words, a person is seized when a reasonable person would not believe he or she was free to leave or disregard the officer's requests based on the totality of the circumstances. *United States v. Lewis*, 842 F. App'x 683, 688 (6th Cir. 2021). Pursuit of a person by law enforcement does not constitute a seizure until the person stops, acquiescing to the show of authority, or the police make physical contact with the fleeing subject. *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991); *see also Phillips*, 677 F. App'x at 295 (6th Cir. 2017) (holding that "[a] suspect who flees from police is not 'seized' in either sense of the word.").

Dixon relies primarily on *Brendlin v. California*, 551 U.S. 249 (2007) for the contention that he was effectively seized when Bellomy was seized, regardless of the fact that he left the scene. The Court thinks Dixon overreads this precedent. It is true that in *Brendlin* the Supreme Court held that the passenger in that case was seized and entitled to challenge the stop. But under the circumstances of *Brendlin* "any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission." *Brendlin*, 551 U.S. at 257. The Court further explained that "a traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver, diverting both from the stream of traffic to the side of the road, and the police activity that normally

5

amounts to intrusion on "privacy and personal security" does not normally (and did not here) distinguish between passenger and driver." *Id*.

In the context of the vast majority of traffic stops *Brendlin* would carry the day as they are, like in that case, occurring on the side of the road and curtailing the travel of the passenger and driver equally. Not so in this case. Here the record is clear that Bellomy and Dixon had already stopped and exited the vehicle before any interaction with law enforcement began. When Bellomy and Dixon left the Pilot and began returning towards their Cadillac, they were approached by Trooper Ellis. When Trooper Ellis engaged Bellomy over his parking, Dixon abruptly about-faced and was not seen again. In this context, the more traditional rules about seizure articulated in *Phillips* are a better fit. *Phillips*, 677 F. App'x at 295 (6th Cir. 2017) ("A Fourth Amendment seizure occurs only when an officer (1) 'applies physical force to restrain a suspect' or (2) uses a 'show of authority' that actually causes the suspect to submit.") And under that framework Dixon was not seized because he did not actually submit, even if he was subjected to a show of authority when Trooper Ellis interacted with Bellomy over the parking infraction. Instead, he left the scene.[1] Dixon's objection that he did have standing to challenge the stop of Bellomy is therefore overruled. While Dixon's lack of standing is functionally the end of the matter, the Court will, in the interest of thoroughness, address the rest of his objections alongside Bellomy's.

---

[1] Dixon takes issue with Judge Stinnett's characterization of this as flight. [R. 48 at 5.] In his view, he merely walked away from the scene with "the full knowledge and acquiescence of the Troopers" and that "[g]iven the shocking fight between the Troopers and [Bellomy]…[Dixon] had good reason not to return while the Troopers were present." *Id*. As Dixon acknowledges, resolving this objection is not required to resolve the standing issue, but the Court is not convinced that it would be unreasonable to describe an individual abruptly changing directions to avoid a police interaction and then failing to return to the scene – where the individual's ride presumably remains – as "flight."

6

**B**

Next, the Court considers the Defendants' objections to Judge Stinnett's conclusion that the troopers did not unlawfully extend the traffic stop, or alternatively, to Judge Stinnett's determination that there was reasonable suspicion to extend the stop. For this first objection over the length of the stop, the Defendants argue that the officers were not performing tasks related to the traffic violations but instead shifted over to investigating their "unsupported hunch" that drug trafficking activity was afoot – thereby unlawfully extending the stop. [R. 48 at 6-7; R. 49 at 2-4.] For their second objection over the length of the stop, the Defendants attack Judge Stinnett's conclusion that reasonable suspicion existed to prolong the stop by attempting to undermine the twelve facts upon which the officers relied to justify their suspicions. [R. 48 at 8-18; R. 49 at 4-8.]

During traffic stops officers can lawfully engage in those inquiries which "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.") What they may not do is extend the traffic stop beyond the time necessary to accomplish its purpose in order to conduct a dog-sniff or engage in other investigative activity unrelated to that purpose. *Id*. at 357. The Sixth Circuit has made clear that other inquiries which do not extend the duration of the stop are permissible. *United States v. Howard*, 815 F. App'x 69, 76 (6th Cir. 2020).

In this case, Trooper Ellis stopped Bellomy over the observed parking infraction – parking in a handicap spot without the appropriate placard. As part of the interaction, Bellomy handed over a Kentucky ID and indicated that he did not have an operator's license. Bellomy's

7

lack of a valid license was confirmed by Trooper Whitlock when he ran Bellomy's information through his MDT. At this point the purpose of the stop expanded, to which the Defendants' objections give little credit. Under Kentucky law, unlicensed drivers are not allowed to operate motor vehicles. K.R.S. § 186.620. Beyond simply writing a ticket for Bellomy's parking infraction, the officers now had to ensure the vehicle was lawfully removed from the scene.

Courts have repeatedly determined that is not an impermissible extension of a stop to deal with a driver's "legal inability to remove the vehicle from the scene." *United States v. Soderman*, 983 F.3d 369, 374 (8th Cir. 2020) (citing *United States v. Ovando-Garzo*, 752 F.3d 1161, 1164 (8th Cir. 2014)). Typically, a "stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." *Arizona v. Johnson,* 555 U.S. 323, 325 (2009). But here the Troopers "had every right under KRS §§ 186.410(1) and 186.620 to not only issue a citation to [Bellomy] for driving without a valid driver's license, but also to ensure that [Bellomy], an unlicensed driver, did not drive away in the vehicle." *United States v. Lyvers*, No. 5:13-CR-58-JMH, 2013 WL 4039806 (E.D. Ky. Aug. 7, 2013).

Indeed, the situation in this case is virtually on all fours with *Lyvers*. The officers could not simply allow Bellomy to get in the car and drive off and his passenger was now nowhere to be found. In fact, Trooper Ellis even inquired as to whether passenger Dixon had a valid license and further engaged with Bellomy to determine the vehicle's ownership, insurance status, and whether another licensed individual could retrieve it. Trooper Ellis and Bellomy settled on having Bellomy's mother, the car's owner, come get the vehicle and Bellomy promptly reached

8

out to her by phone. [2] [R. 37 at 42-44.] Crucially, it was during the time in which Bellomy was attempting to get in contact with "his" mother to secure the vehicle that Trooper Whitlock took Dex to conduct an open-air sniff of the Cadillac. And as Trooper Ellis made clear at the suppression hearing, the stop would have continued until Bellomy's mother arrived or a tow truck did. *Id*. at 50.

Bellomy's assertion that the stop was extended because the officers spent "10-15 minutes of observing the violation including watching it occur in front of them, and then another at least 10-15 minutes questioning someone on a violation that was clear – parking in a handicap stop, tint, and no license" is not well taken. [R. 49 at 3.] While the officers observed the infraction almost immediately, they did not stop Bellomy until he actually returned to the vehicle. The officers' failure to leap immediately into action the instant they observed the parking violation did not extend the actual stop itself. Furthermore, the Court has already explained that functionally the stop was extended by the need to handle lawful disposition of the vehicle once the officers were aware Bellomy could not drive it away – a far more involved process than having the officers simply write a ticket and proceed on their way. The stop was therefore not unlawfully extended.[3]

---

[2] The suppression hearing ultimately revealed the individual Bellomy spoke to was not his mother and that the car was actually registered to Dixon's mother. [R. 37 at 152.]

[3] The Defendants also object at length to Judge Stinnett's conclusion that the officers had reasonable suspicion to extend the stop. [R.48 at 8-18; R. 49 at 4-8.] The Court has doubts over whether the Defendants' piecemeal treatment of the twelve facts the officers relied on to justify their suspicion is the proper approach. *See United States v. Pacheco*, 841 F.3d 384, 391 (6th Cir. 2016) ("A 'divide-and-conquer' analysis' where each factor is singled out and the court engages in a post-hoc search for an innocent explanation—is not permitted."); *see also United States v. Arvizu*, 534 U.S. 266, 273-74 (2002) (Appeals court's evaluation and rejection of seven factors in isolation from each other did not properly take into account the "totality of the circumstances.") Nevertheless, the Court need not address this objection in great detail because its resolution is ultimately irrelevant to the outcome. Because the stop was not extended by the dog sniff, reasonable suspicion was not necessary.

C

Finally, the Court turns to the Defendants' objection to Judge Stinnett's conclusion that the vehicle search was reasonable. Judge Stinnett determined that Dex was reliable based on his training and certification. [R. 47 at 16-18.] In doing so Judge Stinnett rejected the Defendants' claims that Dex's bathroom break or the lack of narcotics within the vehicle undermined that reliability. *Id*. at 20-22. Judge Stinnett also found the Defendants' allegations of cuing by Trooper Whitlock to be unsupported by the record. *Id*. at 18-20. Dixon objects to Judge Stinnett's conclusion on both Dex's reliability and Whitlock's alleged cuing. [R. 48 at 18-24.] He also appears to suggest that this *particular* drug-detection dog "does not just alert to the presence of drugs or the residual odor of drugs previously present, but also alerts to odors which have no relevance to probable cause." *Id*. at 22-24. Defendant Bellomy's objection to Judge Stinnett's Recommendation primarily focuses on the alleged cuing. [R. 49 at 9-10.]

1

A drug-detection dog's positive alert provides probable cause, unless the defendant can present evidence undermining the dog's reliability. *Florida v. Harris*, 568 U.S. 237, 246–48 (2013) ("Evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.") The defendant may undermine that reliability by presenting evidence suggesting that the dog was improperly trained, influenced by its handler, or otherwise unreliable in the particular search at issue. *United States v. Diaz*, 25 F.3d 392, 394-96 (6th Cir. 1994).

10

Substantial evidence exists in this case to show that Dex was a well-trained and reliable drug-detection dog. Dex started his career by completing an initial eight-week training course covering drug odor imprinting, tracking, apprehension, and obedience. [R. 37 at 123.] He was certified by a third-party evaluator and has been recertified annually since 2020. *Id*. In the months leading up to the present incident, Trooper Whitlock and Dex completed approximately 131 hours of patrol and detection training, including negative and blind detection exercises across a range of narcotics. *Id*. at 126-28. Dex's training logs reflect no unsatisfactory performances since October 2022 and a high success rate over several years of training and fieldwork. *Id.* at 129-130. Admittedly, Dex's record contains some gaps (April 2021, March 2022-June 2022 and April 2023) but in the months leading up to the November 7, 2023 interaction there is again no record of unsatisfactory performances. Judge Stinnett noted that Dex arguably had an error rate of ~10%, which is borderline, but "[a] low percentage of false alerts is not necessarily fatal to a finding that a drug detection dog is properly trained and certified." *United States v. Mitchell*, 81 F.3d 162, at *2 (6th Cir. 1996) (Table); *United States v. Navarro-Camacho*, 186 F.3d 701, 706 (6th Cir. 1999) (holding district court's finding drug-detection dog reliable was not clearly erroneous when expert testified canine was "functional at certification standards" of "90 percent.") Despite some past errors, the training and certification Dex received, including in the months leading up to the search at issue, convince the Court that he is reliable.

The Defendants do not successfully undermine that conclusion by challenging Dex's performance on November 7, 2023. In their view, the alert was unreliable because Dex was initially distracted when led around the vehicle. [R. 48 at 21.] True, but this ignores the nature of Trooper Whitlock's testimony. When first deployed Dex *was* distracted by his own bodily

11

urges. But upon resolution of that issue, Dex was demonstrably more focused and only then alerted. To put it more simply, Dex only failed to alert when he was justifiably distracted – this does not convince the Court that he is unreliable. *See also United States v. Griffin*, 2022 WL 2071053 at *14 (E.D. Mich. June 8, 2022) (drug-detection dog still reliable even when it was momentarily distracted during sniff and when it "lurched away" from car's exhaust).

Dixon also suggests that Dex in particular "alerts to odors which have no relevance to probable cause." [R. 48 at 24.] He appears to reach this conclusion from Trooper Whitlock's statement that it is common for Dex to alert to the "odor of lingering drugs" and extrapolates to the conclusion that Dex is unreliable because he could merely alert to odors from "a drug user around or touching the vehicle's exterior." *Id*. at 23-24. Yet the Sixth Circuit has roundly rejected the notion that an alert to residual odor undermines probable cause. *Diaz*, 25 F.3d at 396 (upholding finding of probable cause even where drug-detection dog detected drugs that were no longer present); *United States v. Stubblefield*, 682 F.3d 502 (6th Cir. 2012) (upholding finding of probable cause based on drug-detection dog's alert even when only contraband discovered was counterfeit currency); *United States v. Boxley*, 373 F.3d 759 (6th Cir. 2004)("We recognize that an alert in the context of a canine narcotics sniff indicates that narcotics are present in the item being sniffed or have been present in such a way as to leave a detectable odor.") Dixon's argument that Dex is unreliable because he may only detect the odor of lingering drugs would therefore seem to fly in the face of precedent. Furthermore, the record indicates that marijuana residue was found in the vehicle's inner console, consistent with Dex's alert near the driver's door – a far cry from an alert caused by a drug user's passing prior presence.

**2**

Nor is the Court convinced that Dex's alert was the product of improper handler influence, i.e. cuing. Courts have acknowledged that "less than scrupulously neutral procedures, which create at least the possibility of unconscious 'cuing,' may well jeopardize the reliability of dog sniffs." *Diaz*, 25 F.3d at 396 (quoting *United States v. Trayer,* 898 F.2d 805, 809 (D.C.Cir.)). As other courts have acknowledged, the line for cuing is "far from bright." *United States v. Acosta*, 2019 WL 454247 at *11 (N.D. Iowa Feb. 5, 2019) (finding no cuing when officer's actions were "were intended merely to focus [the dog's] attention on the car.") The Defendants in this case focus on the fact that Dex made three prior trips around the car before alerting on the fourth, after Trooper Whitlock made the "check" command and indicated toward the vehicle. Based on the evidence before it, the Court does not see this as cuing Dex's alert. Dex was initially distracted which, as the Court has laid out above, explains the differences in his attention before relieving himself and after. Indeed, the record indicates that prior to Dex answering the call of nature, Trooper Whitlock gave the "check" command and indicated toward the vehicle – an ineffectual "cue" if ever there was one. This reinforces the conclusion that Dex was not in fact subject to improper influence from Whitlock. Instead, the Court reaches the same conclusion as Judge Stinnett. The "check" command is intended to get Dex to focus, a command he direly needed following his natural urges. Once Dex was focused – and not cued as the Defendants assert – he alerted properly, giving the Trooper probable cause to search the vehicle.

### III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant William Dixon's Objections **[R. 48]** are **OVERRULED;**

2. Defendant Desmond Bellomy's Objections **[R. 49]** are **OVERRULED**;

3. Judge Stinnett's Report and Recommendation **[R. 47]** is **ADOPTED** as and for the opinion of the Court;

4. Defendant William Dixon's Motion to Suppress **[R. 22]** is **DENIED;** and

5. Defendant Desmond Bellomy's Motion to Suppress **[R. 23]** is **DENIED.**

This the 28 day of May, 2025.

Gregory F. Van Tatenhove
United States District Judge